# In the
# United States Court of Appeals
## For the Seventh Circuit
---

No. 04-2225

JENNY WERNSING,

*Plaintiff-Appellant*,

*v.*

DEPARTMENT OF HUMAN SERVICES, State of Illinois,

*Defendant-Appellee*.

---

Appeal from the United States District Court
for the Central District of Illinois.
No. 02-3149—**Jeanne E. Scott**, *Judge*.

---

ARGUED SEPTEMBER 22, 2005—DECIDED OCTOBER 21, 2005

---

Before EASTERBROOK, EVANS, and SYKES, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. This appeal presents the question whether a common personnel-management practice violates the Equal Pay Act of 1963, 29 U.S.C. §206(d). Like many employers both public and private, the Department of Human Services in Illinois gives lateral entrants a salary at least equal to what they had been earning, plus a raise if that is possible under the scale for the new job. Jenny Wernsing contends that the normal raise at the Office of the Inspector General, where she works, is 10%. This practice, Wernsing maintains, discriminates against women and thus violates federal law.

When Wernsing was hired in 1998 as an "Internal Security Investigator II," the civil service classification of that job allowed a monthly pay from $2,478 to $4,466, depending on prior experience and years of service. Wernsing, who had been earning $1,925 monthly as a Special Agent with the Southern Illinois Enforcement Group, started with the Department at $2,478, a raise of almost 30%. People who came to the Department from more remunerative positions landed higher salaries (though lower percentage raises). For example, Charles Bingaman, hired contemporaneously with Wernsing, had a prior salary of $3,399 monthly as a Child Welfare Specialist III at the state's Department of Children and Family Services. He received a monthly salary of $3,739 to start his new job, a 10% raise. Wernsing and Bingaman do the same work but at substantially different pay as a result of this process for determining initial salaries. Annual raises preserve the relative gap until employees reach the maximum of the pay scale. Bingaman will top out years before Wernsing does.

Section 206(d)(1) establishes this rule: "No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions". Wernsing observes that she performs the same tasks as Bingaman, under the same working conditions, yet is paid substantially less; it follows, she contends, that the Department must raise her salary. The difficulty with this argument is that §206(d)(1) forbids differences "on the basis of sex" rather than differences that have other origins—and §206(d)(1)(iv) drives this home by exempting any pay "differential based on any other factor other than sex". Wages at one's prior employer are a "factor other than sex" and so, the district judge held, an employer

may use them to set pay consistently with the Act.

Although three decisions of this court have held that prior wages are a "factor other than sex"—see *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446 (7th Cir. 1994); *Riordan v. Kempiners*, 831 F.2d 690 (7th Cir. 1987); *Covington v. Southern Illinois University*, 816 F.2d 317 (7th Cir. 1987)—Wernsing contends that we should rule in her favor anyway. She advances two principal arguments: first that the Department lacks an "acceptable business reason" for its approach; second that because all pay systems discriminate on account of sex, any use of prior pay to set salary must be discriminatory. We start with the first of these contentions.

Four appellate courts have held that wages in a former job are a "factor other than sex" only if the employer has an "acceptable business reason" for setting the employee's starting pay in this fashion. See *Aldrich v. Randolph Central School District*, 963 F.2d 520 (2d Cir.), cert. denied, 506 U.S. 965 (1992) (with three Justices dissenting); *EEOC v. J.C. Penney Co.*, 843 F.2d 249 (6th Cir. 1992); *Kouba v. Allstate Insurance Co.*, 691 F.2d 873 (9th Cir. 1982); *Glenn v. General Motors Corp.*, 841 F.2d 1567 (11th Cir. 1988). Wernsing insists that Illinois lacks an "acceptable" reason—despite the evident benefit of making the job more attractive to the best candidates—because the state's civil service criteria call for more attention to employees' background and skills than to the market. New employees are supposed to start at the bottom of the range, see 80 Ill. Admin. Code §310.490(b), with higher salary only if justified by "directly related training and experience", *id.* at §310.490(b)(A). Making a public salary track wages elsewhere is faithless to civil-service principles, Wernsing insists. Yet the Equal Pay Act is not a back-door means to enforce civil-service laws; if Wernsing thinks the Department's practice bad under state law, she is in the wrong court. (Given the eleventh amendment and principles of

state sovereign immunity, federal courts cannot enforce state law against the state itself.)

Section 206(d) does not authorize federal courts to set their own standards of "acceptable" business practices. The statute asks whether the employer has a reason other than sex—not whether it has a "good" reason. Accord, *Taylor v. White*, 321 F.3d 710, 719 (8th Cir. 2003) ("the wisdom or reasonableness of the asserted defense" is irrelevant); *Strecker v. Grand Forks County Social Services Board*, 640 F.2d 96 (8th Cir. 1980) (en banc). Congress has not authorized federal judges to serve as personnel managers for America's employers. As we say frequently when dealing with equivalent questions under other federal statutes, such as Title VII of the Civil Rights Act of 1964: "A district judge does not sit in a court of industrial relations. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII and §1981 do not interfere*." Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560-61 (7th Cir. 1987).

Employment-discrimination statutes forbid reliance on criteria such as race and sex. Provided that they avoid these, employers are free to set their own standards. Under Title VII and other anti-discrimination statutes, once the plaintiff makes a *prima facie* case of discrimination, all the employer need do is articulate a ground of decision that avoids reliance on the forbidden grounds. The plaintiff then bears the burden to show that the stated reason is a pretext for a decision really made on prohibited criteria. See *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). Proof that the actual reason disserves the employer's interests does not discharge that burden, as long as the employer does not rely on one of the forbidden grounds. See *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655 (7th Cir. 1991) (en banc).

*Kouba*, which originated the "acceptable business reason" requirement, did not explain its genesis; it was advanced as ukase. The ninth circuit proceeded as if the Equal Pay Act worked like the disparate-impact theory under Title VII: if the plaintiff shows that an employment practice adversely affects protected workers as a group, then the employer must provide a strong reason ("business necessity") for the practice. See, e.g., *Albemarle Paper Corp. v. Moody*, 422 U.S. 405 (1975). (The Civil Rights Act of 1991 modified the approach of *Albemarle Paper*, see 42 U.S.C. §2000e-2(k), but the change does not matter for present purposes.) An analogy to disparate-impact litigation under Title VII does not justify a "business reason" requirement under the Equal Pay Act, however, because the Equal Pay Act deals exclusively with disparate treatment. It does not have a disparate-impact component. *County of Washington v. Gunther*, 452 U.S. 161, 170-71 (1981); *Los Angeles v. Manhart*, 435 U.S. 702, 710-11 n.20 (1978). And in disparate-treatment litigation under other employment-discrimination statutes, the rule is the one we have already summarized: the employer may act for any reason, good or bad, that is not one of the prohibited criteria such as race, sex, age, or religion.

Circuits that have followed the ninth likewise do not locate an acceptable-business-reason requirement in either the statutory text or the rules developed under other similar statutes. The eleventh circuit, for example, asserted (again as a ukase) that employers are forbidden to set salaries based on competitive markets, and as prior salary reflects economic competition it is off limits to employers. The eleventh circuit recognized that it was disagreeing with our holding in *Covington* and stated: "The flaws of the *Covington* decision are that the Seventh Circuit implicitly used the market force theory to justify the pay disparity and that the Seventh Circuit ignored congressional intent as to what is a 'factor other than sex.' Consequently, we

reject *Covington* because it ignores that prior salary alone cannot justify pay disparity." 841 F.2d at 1571. We're not sure what "congressional intent" the eleventh circuit thought we had ignored; Congress makes legal rules through statutes rather than pure "intent" demonstrated by statements in committee reports or on the floor. See, e.g., *Pierce v. Underwood*, 487 U.S. 552, 566-68 (1998); *Brill v. Countrywide Home Loans, Inc*., No. 05-8024 (7th Cir. Oct. 20, 2005). The Equal Pay Act forbids sex discrimination, an intentional wrong, while markets are impersonal and have no intent. To the extent other circuits believe that employers must disregard wages set in markets, they have adopted a variant of the comparable-worth doctrine—the view that wages must be based on "merit" rather than forces of supply and demand. This circuit rejected the comparable-worth theory in *American Nurses' Ass'n v. Illinois*, 783 F.2d 716 (7th Cir. 1986), and we have been given no reason to reconsider that decision.

Our opinion in *Dey* reiterated the conclusion of *Covington*: "The factor [other than sex] need not be 'related to the requirements of the particular position in question,' nor must it even be business-related." 29 F.3d at 1462. The disagreement between this circuit (plus the eighth) and those that require an "acceptable business reason" is established, and we are not even slightly tempted to change sides. Our position has the support of the language in §206(d), the practice under other employment-discrimination regimes, and the holdings of the eighth circuit. The opposing view rests on an "intent" that, if not manufactured by the judges rather than discovered by digging through legislative debates, lacks any footing in enacted texts.

Thus we turn to Wernsing's second argument: that because women earn less than men from private employment, all market wages must be discriminatory and therefore must be ignored when setting salaries. The premise is correct; many empirical studies show that

women's wages are less than men's on average. See, e.g., *Statistical Abstract of the United States* Table 681 (2004-05); Finis Welch, *Growth in Women's Relative Wages and in Inequality Among Men: One Phenomenon or Two?*, 90 Am. Econ. Rev. 444 (Papers & Proceedings 2000). But the conclusion is a non-sequitur. Wages rise with experience as well as with other aspects of human capital. That many women spend more years in child-rearing than do men thus implies that women's market wages will be lower on average, but such a difference does not show discrimination—a point that we made in *American Nurses*, 783 F.2d at 719. See also June O'Neill, *The Gender Gap in Wages, circa 2000*, 93 Am. Econ. Rev. 309 (Papers & Proceedings 2003).

Wage patterns in some lines of work could be discriminatory, but this is something to be proved rather than assumed. Wernsing has not offered expert evidence (or even a citation to the literature of labor economics) to support a contention that the establishments from which the Department recruits its employees use wage scales that violate the Equal Pay Act and thus discriminate against women. If sex discrimination led to lower wages in the "feeder" jobs, then using those wages as the base for pay at the Department would indeed perpetuate discrimination and violate the Equal Pay Act. See *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974). Cf. *Bazemore v. Friday*, 478 U.S. 385 (1986); *Reese v. Ice Cream Specialties*, 347 F.3d 1007 (7th Cir. 2003). But as the record is silent about this possibility, and plaintiffs bear the burden of persuasion in civil litigation, the Department is entitled to the summary judgment it received.

When Wernsing asked the Department for a raise to match Bingaman, the reason she gave is that her prior salary had been lower than his because she had worked for

a small, nonprofit employer; she did not suggest that either her former employer or Bingaman's was out of compliance with the Equal Pay Act. Indeed, she has not even tried to show disparate impact; for all this record shows, the Department's female internal security investigators make as much on average as the men. Wernsing's position from the beginning has been that the Department's salary-setting practices hurt *her*, not that they harm women generally. (Wernsing demonstrated on the record that four other men holding the Internal Security Investigator II position also are paid more than she is because they came to the Department from higher-paying positions. She contends that the district court should have let her make a similar demonstration for other men, but the absolute number is beside the point and so the ruling *in limine*, right or wrong, does not affect the judgment.)

In lieu of proof, Wernsing relies on a statement that a Senate committee made 42 years ago: that "the wage structure of 'many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same.'" S. Rep. 176, 88th Cong. 1st Sess. 1 (1963). That was indeed the view of many employers in 1963, the year the Equal Pay Act came into force, one year before Title VII forbade sex discrimination in private employment, and nine years before Title VII was extended to public employment. But what relevance can this have now that anti-discrimination statutes have been in force for more than two generations? It remains possible that pay differences between men and women reflect discrimination rather than choices made about allocating time between family and market endeavors, and some industries may have been successful in disguising their discrimination. But if this is so it must be established by evidence rather than assumed. Wernsing has abjured her opportunity to supply evidence.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*